WHITE, Judge
(concurring specially).
The alleged scenes in the subject motion picture are undoubtedly shocking. The witnessing of such simulated horrors might well be avoided as a matter of good taste if for no other reason. I nevertheless agree that the exercise of injunctive power in this case exceeded the bounds of sound judicial discretion.
The plaintiffs obtained a temporary restraining order without notice and without bond. Two days thereafter the defendant’s request for bond was denied and the restraint without bond was continued pen-dente lite. At that point in the swift proceedings the defendant had not filed an answer nor presented any motion other than the motion for bond, but the motion for bond was necessarily linked to the complaint. In this situation, according to my appraisal of the complaint, the motion for bond should have been granted, or in the alternative the restraining order should have been dissolved sua sponte and the case determined in due course on the question of whether or not public exhibition of the film constitutes an abatable nuisance within the meaning of the statute, § 64.11, Fla.Stat., F.S.A.
Thus my view of the error stems basically from limitations of the complaint itself in that the facts alleged did not justify the avowed fear of great public harm in the event the defendant was not instantly restrained. The defendant was, of course, immediately prejudiced when the restraining order disrupted its schedule of shows. The following discussion assumes that this particular field is not preempted by Chapter 521, Fla.Stat., F.S.A., relating to exhibition of motion pictures, and Chapter 847, Fla. Stat., F.S.A., relating to criminal responsibility for display of indecent, immoral or sadistic material.
The plaintiffs proceeded in the name of the state under §§ 64.11 and 64.12, Fla.Stat., F.S.A., relating in part to abatement of public nuisances at the instance of private citizens, and I have indicated my conviction that their complaint did not allege a danger menacing enough to call for immediate removal and full investigation later. The statute does authorize dispensing with notice and bond in contemplation of emergencies, and it confers discretionary power to that end. This, however, is a legal discretion to be measured and tested by the factual content of the complaint minus conclusions of the pleader.
Here it may be arguable, contrarily, that the statute contemplates that before denying or ordering immediate restraint the chancellor may consider proofs outside the complaint — and that this presumptively was done here although the record on interlocutory appeal is unrevealing. In my opinion the portion of the statute[1] referred to is merely an affirmation of the chancellor’s right to have further verification of the facts already alleged rather than an authorization to go into unpleaded matters in pais. In any event it would be an inversion of logic to require an appellant, in the position of this defendant, to make and bring up a record of some undisclosed and perhaps non-existent portion of preliminary proceedings of which he had no knowledge.
On principle, if such an order should be entered upon consideration of matters presented but not pleaded, the matters should *564 be noted in the official case file in deference to the chancellor whose order, in the event of appeal, would be backed by an appropriate record of the factors on which it was based. It is not too much to expect that this service should be provided by the party who presumably influenced the decision in his favor; also the prevailing party may, on appeal by his adversary, cause the record to be supplemented if necessary to an adequate review of the case.[2] It therefore is proper to assume that the complaint before us reflects the premises on which the action below was taken.
The plaintiffs described several especially gruesome scenes of cruelty and bloodshed allegedly depicted in the protested film. Apparently these affirmative allegations were deemed sufficient to justify the initial and continued restraint of the defendant pending final adjudication of the case. Inasmuch as the complaint may be measured in part by what it does not allege, let us consider it briefly from that standpoint.
The complaint does not allege any misconduct of spectators during or after any showing of the film. It does not allege any incident or fact indicating that as a result of the show the safety or health of the community was threatened as by fire or physical violence or by contamination of air, food or water; nor does it allege any fact indicating that as a result of the show the peace and quiet of the community was •disturbed as by excessive noise. It does not allege the depiction of voluptuous scenes with sexual intimacies repugnant to public policy; nor does it allege that children were invited or permitted to attend the show. In short, the complaint does not demonstrate by averments of ultimate fact that the defendant was conducting its business in a manner critically detrimental to the health, morals or property rights of the community. Cf. Mayflower Holding Co., Inc. v. Warrick, 1940, 143 Fla. 125, 196 So. 428; Federal Amusement Co. v. State ex rel. Tuppen, 1947, 159 Fla. 495, 32 So.2d 1; Bartlett v. Moats, 1935, 120 Fla. 61, 162 So. 477 ; 52 Am.Jur., Theatres, Etc., § 45.
Accordingly the hasty action against the defendant was without justification unless the described scenes should be deemed clearly a nuisance per se; but the plaintiffs did not present a case of nuisance per se. Cf. 39 Am.Jur., Nuisances, § 63; 66 C.J.S. Nuisances §§ 30, 125; Thebaut v. Canova, 1866, 11 Fla. 143. In the case authority just cited the Supreme Court of Florida said at page 168:
“ * * * before an injunction will be granted ‘ex parte’ and before the hearing on the merits, to restrain a nuisance, it must be shown to be a case of urgent necessity, or one in which irreparable mischief will be produced if the aid of the Court is denied. The object of an injunction before answer is to preserve all things in their then condition, not to determine any by anticipation, or to undo or restore anything. * * *
“If the thing sought to be restrained is in itself a nuisance, and it so appears from the facts set forth in the bill, the court will give its aid to stay irreparable mischief, and will grant a temporary injunction in the first place until the parties can have a hearing. * * * But where the thing sought to be restrained is not unavoidably and in itself noxious, but only something which may, according to circumstances, prove so, then the court will refuse to interfere until the matter has been tried. * * * [latter emphasis supplied]
“The authority of courts of equity, says Judge Story, to interfere by way of injunction in cases of private nuisance, is founded upon the ground of restraining irreparable mischief, or of preventing multiplicity of suits; and it is not every case which will furnish a right of action at law against a party *565 for a nuisance, which will justify the interposition of courts of equity to redress the injury or remove the annoyance.
“On the other hand, where the injury is irreparable, or where loss of health, loss of trade, destruction of the means of subsistence, or permanent ruin to property may or will ensue from the wrongful act or erection, in every such case courts of equity will interfere by injunction, in furtherance of justice and the violated rights of the party.”
The instant complaint, moreover, does not allege facts sufficient to justify immediate restraint on the ground of anticipatory nuisance. In 7 A.L.R. 749, 756, the text reads:
“There must be proof of imminent danger to justify an injunction against the threatened nuisance. * * *
“The complainant must establish the prospective nuisance with clearness and reasonable certainty; the danger apprehended must appear to be imminent, and in the natural course of events, clearly impending, and the injuries in their nature and character irreparable, and it is not sufficient to make out a doubtful or possible case of danger.

In Garnett v. The Jacksonville, St. Augustine and Halifax River Railway Co., 1884, 20 Fla. 889, 902, the court said:
“The general rule is that injunctions against threatened nuisances will not be granted except in extreme cases where the threatened use of property or the act sought to be restrained is clearly shown to be such as leaves no doubt of its injurious results, such results as are recognized to be substantial legal injuries. The bill must set forth such a state of facts as leaves no room for doubt upon the question of nuisance, for if there is any doubt upon that point the benefit will be given to the defendant. Mere allegations of conclusions or opinions as to the contemplated injuries are not sufficient. The precise manner in which he is to be injured must be stated.” [emphasis supplied]
When does the portrayal of evil become a public nuisance ? Is it determined by the peculiar character of the particular evil, or by the demonstrated ill effects of its showing, or by a combination of those factors? Are the objectionable features of a show bad enough to condemn it entirely?
Good and evil have been contrasted and dramatized since the dawn of history. Man’s inhumanity to man has been the central theme of numerous novels, paintings, plays and operatic productions that have passed the censorship of public tolerance or approval. Some are considered classics. This does not argue against official checks on shows featuring material which tends to corrupt public morals, but it points up the not infrequent difficulty of ascertaining just what may be tolerated and what should be suppressed by law. Ordinarily this type of alleged nuisance does not call for abatement in advance of full hearing and final adjudication; and if it becomes a question of weighing doubtful harm to the public against manifest injury to the defendant, the nod should go to the defendant. Thebaut v. Canova, supra.
Reference has been made to the common acceptance of many works of literature and dramatic art which depict tragedy and perversity in various forms. These include “Dracula”, “Beowulf”, Poe’s “Pit and the Pendulum”, Goethe’s “Faust” and its operatic counterparts; also Milton’s “Paradise Lost”, Voltaire’s “Candide”, Shakespeare’s tragedies such as “Macbeth” and “Hamlet”, and the more recent production “Psycho” by Alfred Hitchcock. Modern television and newspapers publish lurid accounts and photographs of torch suicides of Buddhist Monks on the streets of Saigon, mass executions of Cuban dissidents and atrocity murders of American soldiers in Korea. Scenes like these are transmitted willy nilly *566 into millions of homes almost daily. Conventional motion pictures ordinarily do not play to such captive audiences.
Tastes vary with the individual and in the individual. A person who enjoys beauty and harmony may also find interest in shows reflecting the opposite. In Pfingst v. Senn, 1893, IS Ky.Law Rep. 325, 23 S.W. 358, 360 the court noted the difficulty of drawing a true medium among varieties of taste where each citizen has certain rights. The fact that a show is distasteful and highly offensive, even to a proven majority of people, does not necessarily make it subject to suppression by law. The determinative question is whether or riot the particular show in itself, or in its immediate or probable effects, is indeed a public nuisance.
For the reasons stated I concur in the conclusion reached in Judge Shannon’s opinion. The initial restraining order without notice and bond was not justified by the complaint. The complaint, being insufficient as a predicate for that order, was likewise insufficient to support the order for temporary injunction which denied the defendant’s motion for bond and extended the restraint pending outcome of final hearing. The case should be specially remanded for proceedings not inconsistent with the judgment of this court.

. F.S. § 64.12, F.S.A. “In such action the court [on presentation of complaint] * * * may upon proper proof befog made allow a temporary writ * *

. F.A.R. 3.6(d), 31 F.S.A.